Gilbert MARES, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 04–89–00242–CR.

Court of Appeals of Texas,
San Antonio.

Sept. 26, 1990.

Rehearing Denied Oct. 30, 1990.

James E. Shugart, San Antonio, for appellant.

Fred G. Rodriguez, Jane Davis, Robert McClure, Laurie A. Booras, Crim. Dist. Attys., San Antonio, for appellee.

Before PEEPLES, CARR and ONION, JJ.

## OPINION

ONION, Justice.[1]

This is an appeal from a conviction for possession of a controlled substance, to-wit: heroin in an amount of less than 28 grams. Following the jury's verdict of guilty the trial court assessed appellant's punishment at forty (40) years' confinement in the Texas Department of Corrections.[2]

Appellant advances five points of error. In two points he challenges the sufficiency

---

1. Presiding Judge, Retired, Court of Criminal Appeals sitting by assignment pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1988).

2. The Department of Corrections is now the Institutional Division of the Texas Department of Criminal Justice. 1989 Tex.Gen.Laws, ch. 785, § 1.19(f) at 3475. *See* Historical Note to TEX.REV.CIV.STAT.ANN. art. 4413(401) (Vernon Supp.1990).

of the evidence to sustain his conviction. In addition, appellant contends the trial court erred in failing to grant his motion for mistrial when the prosecutor violated a granted motion in limine, erred in giving an "Allen" charge to the jury during their deliberations, and erred in denying a motion for new trial based on jury misconduct. We reach only the first two points of error in our disposition of this cause. We will reverse the judgment of conviction and order an acquittal.

Appellant was one of nine persons who were arrested when a team of Bexar County deputy sheriffs executed a search warrant at an apartment in a public housing development in the city of San Antonio. Three officers entered the front door and three officers entered the back door at the time of the raid. Appellant, a visitor at the premises, was with others watching Monday night football on the television when the officers entered the apartment at 1112 San Fernando Street the in Alazan–Apache Courts. It was later learned that the apartment was leased to Delmira De La Cruz who was not present at the time of the raid. Appellant was tried jointly with Ciro and Elizabeth Sifuentes. Apparently a motion for severance on behalf of Mario Barajas was granted.

Bexar County deputy sheriff Joe Delgado, a narcotics investigator, testified that he was an undercover officer. He related that this accounted for his beard and general appearance, which he admitted gave him the look of a person of disrepute. He acknowledged that he had acquired the street name of "Animal." Delgado stated that he had received information from a reliable informant that the apartment in question was "a safe house" where street vendors picked up their narcotics to sell, but from which house no direct dealing was done. Delgado revealed that he led the team of deputy sheriffs in executing the search warrant within the city limits.

Delgado stated that as the officers exited their vehicles near the apartment, people in the area began yelling "Los Narcos (police), Mario"; that he heard a flushing sound from the open upstairs bathroom window of the apartment; that he had obtained a master key from the Housing Authority and entered the back door with two other deputies, while three other deputies were banging on the front door creating a diversion; that the front door was later knocked down.

Delgado's appearance at the raid was the same as at trial, except that he was wearing a raid jacket with "Police" emblazoned upon the front and back of the jacket. He had his .45 caliber handgun drawn. Delgado related that as he entered the ground floor he initially encountered Rudy Barajas and pushed him out of the way, and got hit in the face by Barajas; that appellant Mares "was also in the way, and he took a couple of swings at me, made an attempt to try to trip me or kick at me when I was going upstairs.... After I pushed him out of the way, like I said, he kicked at me, trying to keep me from getting upstairs." When asked if appellant landed any punches, Delgado replied: "The only thing, just ... I got kicked on the side of the leg when he was pushed away from me."

The record shows Delgado was 6'1" tall and weighed over 200 pounds, and was armed. Delgado described appellant as not being "very tall."

Delgado told the prosecutor it had taken him about eighteen (18) seconds from the time he left his vehicle until he reached the upstairs of the apartment; that he took six seconds to reach the back door and twelve (12) seconds to get up the stairs.

When Delgado reached the upstairs area he encountered Ciro Sifuentes outside the bathroom door, and observed Mario Barajos with his hand on the toilet, having just thrown an object into the toilet bowl. Elizabeth Sifuentes was standing next to the toilet. Delgado retrieved the two bags from the toilet containing nine balloons of alleged heroin. A used syringe was also found in the bathroom. Delgado testified he heard Ciro ask Elizabeth Sifuentes to claim the "soda" (cocaine) and the "chita" (heroin), and he observed that she nodded in agreement. No cocaine was found though Delgado saw a white powdery substance in the toilet being flushed.

In a bedroom Delgado found balloons, syringes and in a closet an Ohio Triple Beam Scale which he related was commonly used in narcotic trafficking. In addition, Delgado found $150.00 in cash on the floor upstairs. Papers were found showing that the apartment was that of Delmira De La Cruz. The bedroom was determined to be that of Jose De La Cruz, her son.

Delgado, the only State's witness as to the occurrences at the scene, testified that six men were found in the living room downstairs. They were Rudy Barajas, the appellant Mares, Jose De La Cruz, Robert Fernandez, Robert Ledesma, and Daniel Dominguez. Delgado testified the room had a television set and couch and was a little larger than the jury box; that it was crowded with the six men in it. Deputy Delgado stated "most" of the men were "spaced out" or "mellow" meaning "taking it easy going" or "really didn't care," apparently from the use of narcotics. Upon interrogation by the prosecutor, Delgado exempted Rudy Barajas and the appellant from the description because they seemed to care. Delgado observed beer cans and quart beer bottles in the room and admitted beer could have caused the condition described. No contraband or paraphernalia or a significant amount of money was found on any of the men. No needle or track marks were found on the appellant. No narcotics or paraphernalia were found in the downstairs area. A gun was discovered under the stairwell, but its ownership was not determined. Delgado related that, while the raid was still in progress, several people came to the back door of the apartment asking for "Mario" or "Cujo" (street name for Jose De La Cruz) and indicating that they wanted to "score."

On cross-examination Delgado was asked about his offense report which listed only three unnamed Latin males as being downstairs. The record then reflects:

Q: Do you know which one of them it was that kicked you?

A: To my recollection it was Mr. Mares.

Q: When you say "to my recollection," is that your best guess or . . .

A: No, sir. He was the closest one to me at the time.

Q: Therefore, you guess it was him that kicked you?

A: Like I said, he was the only one there.

The chain of custody of the contraband was established. Jeff Todd, a chemist, testified the substance submitted to him was 740 milligrams of heroin, less than one gram of the controlled substance; that 28 grams were approximately an ounce.

Rudy Barajas, whose indictment had been dismissed the day before by the State, testified for the defense. He related that he and his brother, Mario, had been invited by Jose De La Cruz to watch a football game on television on the date in question; that he arrived at the apartment about 8:00 p.m. and about 2 hours later, while they were watching television in the small living room he heard banging noises at the door; that people outside the door began yelling in Spanish; "We have guns. We're going to kill you. Open up the door." Everyone inside got up. Barajas stated he was scared. He revealed that Ciro and Elizabeth Sifuentes then went upstairs and that Dominguez and Ledesma followed; that De La Cruz who had come downstairs, went back up the stairs; that the front door was knocked down and men came into the room; that the lights were not on and there was much confusion. He did not know at first the men were police officers. Rudy Barajas related the entering men began to hit "us," and a large man whom he identified as Delgado knocked him down, then pushed the appellant down before proceeding up the stairs. He did not see the appellant kick or take any action at all. He claimed that he, his brother and the appellant were downstairs at all times; that he never saw any drug use at all.

Jose De La Cruz testified the apartment was his mother's home, and that he lived there at the time in question. He related that on September 12, 1988, he had invited several of his long time friends from school days to watch Monday night football on television; that while his friends watched television he left the apartment alone and

purchased a small amount of heroin on Colima Street; that upon his return he took two "fixes," and was alone in his upstairs bedroom cutting the heroin and placing it in balloons when he heard the yelling and the banging at the door. De La Cruz immediately flushed his heroin down the commode and went down the stairs, but went back up before the officers came in. He related that Ciro and Elizabeth Sifuentes, Dominguez and Ledesma all came up to his bedroom after the banging and yelling at the door commenced.

De La Cruz stated they were all arrested with guns being pointed at their heads by officers in plain clothes. He acknowledged that the heroin syringes, balloons and the scale were all his. De La Cruz then told the jury he had been released the next day, and had never been indicted.

The appellant did not testify.

The court in its charge defined "possession" as meaning "the actual care, custody, control or management of the controlled substance." The court also charged abstractly on the law of parties and in applying the law to the fact authorized the jury to convict if it found beyond a reasonable doubt that the appellant had possession of heroin "either acting alone or together with another as a party."

After the jury retired to deliberate the jury sent a note to the court requesting: "Transcript on Officer Delgado to see what Gilbert's [appellant's] position and action at the stairway was." The court instructed the jury it had to be in dispute and to specify the particular point in dispute before the testimony would be read to them. The next note read: "Was the Officer's testimony that Gilbert impeded officer's progress up the stairs in any way? This is our dispute, whether his testimony was yes or no." Over objection the court had read back to the jury the officer's testimony on direct examination only. Later the jury informed the court it had reached verdicts as to the co-defendants, but as to the appellant's case the note read: "Judge, in good conscience we will not change our minds and we are at a definite deadlock." Thereafter, the court gave the jury a version of the so-called "Allen" or "dynamite" charge, which appellant refers to as a cross between the charges given in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) and *Arrevalo v. State*, 489 S.W.2d 569 (Tex.Crim.App.1973). The jury later returned its general verdict of guilty.

■ The standard for reviewing the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 n. 12, 99 S.Ct. 2781, 2789 n. 12, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234 (Tex.Crim.App.1989); *Dickey v. State*, 693 S.W.2d 386, 387 (Tex.Crim.App.1984); *Carlsen v. State*, 654 S.W.2d 444 (Tex. Crim.App.1983) (opinion on reh'g). The standard for review is the same in both direct and circumstantial evidence cases. *Chambers v. State*, 711 S.W.2d 240 (Tex. Crim.App.1986); *Christian v. State*, 686 S.W.2d 930, 934 (Tex.Crim.App.1985); *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984).

■ A conviction based upon circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the defendant's guilt. *Humason v. State*, 728 S.W.2d 363, 366 (Tex.Crim.App.1987); *Burns v. State*, 676 S.W.2d 118, 120 (Tex. Crim.App.1984). Proof which amounts only to strong suspicion or mere probability of guilt is insufficient to support a conviction. *Humason* 728 S.W.2d at 366; *Moore v. State*, 640 S.W.2d 300, 302 (Tex.Crim. App.1982). If, after viewing the evidence in this light, there is a reasonable hypothesis other than the guilt of the accused, then it cannot be said that the guilt has been shown beyond a reasonable doubt. *Martin v. State*, 753 S.W.2d 384, 387 (Tex.Crim. App.1988); *Anderson v. State*, 701 S.W.2d 868, 872 (Tex.Crim.App.1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 163 (1986).

"It is essential to a conviction for any offense that the accused be criminally responsible either because it is committed by

his own conduct or by the conduct of another for whom he is criminally responsible. *See* V.T.C.A. Penal Code §§ 6.01 and 7.01." *Zuckerman v. State,* 591 S.W.2d 495, 496 (Tex.Crim.App.1979). *See also Gutierrez v. State,* 628 S.W.2d 57, 66–67 (Tex.Crim. App.1982) (opinion on reh'g) (finding the circumstantial evidence insufficient to sustain conviction in defendant's individual capacity, but sufficient under the law of parties).

■ In order to prove unlawful possession of a controlled substance, the State must prove the accused (1) exercised care, control and management over the contraband, and that (2) the accused knew the substance he possessed was contraband. *Cude v. State,* 716 S.W.2d 46, 47 (Tex.Crim. App.1986); *Rhyne v. State,* 620 S.W.2d 599, 601 (Tex.Crim.App.1981); *Dubry v. State,* 582 S.W.2d 841, 843 (Tex.Crim.App. 1979). Possession of contraband need not be exclusive and evidence which shows that the accused jointly possessed the contraband with another is sufficient. *McGoldrick v. State,* 682 S.W.2d 573, 578 (Tex. Crim.App.1985); *Oaks v. State,* 642 S.W.2d 174, 176 (Tex.Crim.App.1982); *Lancaster v. State,* 734 S.W.2d 161, 163 (Tex.App.—Fort Worth 1987, pet. ref'd).

■ Whether the theory of prosecution is sole or joint possession, the evidence must affirmatively link the accused to the contraband by a showing which indicates the accused's knowledge and control of the contraband. *Waldon v. State,* 579 S.W.2d 499, 501 (Tex.Crim.App.1979). The burden of showing an affirmative link or links rests on the State. *Damron v. State,* 570 S.W.2d 933, 935 (Tex.Crim.App.1978). The mere presence of a defendant at the scene of an offense does not make him a party to joint possession. *Oaks* at 177. It has been said possession means more than being

where the action is, it involves the exercise of dominion and control over the thing allegedly possessed. *Brown v. State,* 481 P.2d 475, 477 (Okla.Crim.App.1971); *Oaks* 642 S.W.2d at 177. Where the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband. *Wiersing v. State,* 571 S.W.2d 188, 190 (Tex.Crim.App. 1978). The issue then is whether the State established such independent facts and circumstances to affirmatively link the appellant to the heroin by sole or joint possession and show his guilt in his individual capacity.

■ Affirmative and relevant facts linking an accused to the contraband have been noted and listed in several opinions. *See e.g. Martin v. State,* 753 S.W.2d 384 (Tex. Crim.App.1988); *Guiton v. State,* 742 S.W.2d 5, 8 (Tex.Crim.App.1987); *Oaks, supra. See also Chavez v. State,* 769 S.W.2d 284, 288–89 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd); *Trejo v. State,* 766 S.W.2d 381, 384–85 (Tex.App.—Austin 1989, no pet.).

Many of the more common affirmative links are not found in the instant case. The heroin found upstairs was not in plain view of the appellant,[3] nor was it in close proximity and readily accessible to the appellant.[4] The amount of the heroin found was certainly not large enough to indicate that the accused knew of its presence.[5] Appellant was not shown to be closely related to other persons in joint possession of the contraband or who owned or leased the premises where the contraband was found.[6] The conduct of the accused with respect to the contraband was not such as to indicate his control and knowledge.[7] Appellant

---

**3.** *See Pollan v. State,* 612 S.W.2d 594, 596 (Tex. Crim.App.1981); *Hernandez v. State,* 538 S.W.2d 127, 131 (Tex.Crim.App.1976).

**4.** *See Pollan, supra,* at 596; *Hahn v. State,* 502 S.W.2d 724, 725 (Tex.Crim.App.1973).

**5.** *Pollan, supra,* at 596; *Carvajal v. State,* 529 S.W.2d 517, 520–21 (Tex.Crim.App.1975), *cert.*

*denied,* 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976).

**6.** *Hernandez, supra,* at 130.

**7.** *Pollan, supra,* at 596; *Hernandez, supra,* at 131; *Raleigh v. State,* 740 S.W.2d 25, 28 (Tex. App.—Houston [14th Dist.] 1987, no pet.).

made no incriminating statement and did not attempt to flee, and there were no furtive gestures towards the contraband.[8] Appellant was not shown to be under the influence of heroin or other contraband. He was not shown to have needle or track marks on his body. Further, he did not possess a significant amount of money. Appellant was not a lessee or occupant of the premises in question.

The State relies upon appellant's presence plus Officer Delgado's testimony as to appellant's conduct. Delgado agreed that it was "pandemonium" when the six officers entered the small room already occupied by six men. Delgado, the larger man and armed, found the appellant in his way, and initially pushed him down. A close reading of Delgado's testimony shows that appellant's conduct was in reaction to Delgado's act. There was no evidence to affirmatively link him to the upstairs bathroom or bedroom.

All of these circumstances, in our view, establish at most a mere suspicion of appellant's guilt and do not exclude every reasonable hypothesis other than appellant's guilt. The State has failed to meet its burden of proof beyond a reasonable doubt by either direct or circumstantial evidence as to appellant's guilt in his individual capacity as a sole or joint possessor of the heroin. *See and cf. Brunson v. State,* 750 S.W.2d 277 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd).

■■■■ We must next address the sufficiency of the evidence to show appellant criminally responsible for the conduct of another in committing the offense. *See Sewell v. State,* 578 S.W.2d 131, 136 (Tex. Crim.App.1979). For one to be criminally responsible as a party, the State must prove that the defendant acted with the intent to promote or assist in the commission of the offense by soliciting, encouraging, directing, aiding, or attempting to aid the other person in its commission. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 1974); *Romo v. State,* 568 S.W.2d 298, 303 (Tex.Crim.App.1978) (opinion on reh'g). Where the evidence shows a defendant was

not the primary actor, but at most responsible for the actions of the primary actor, the State must prove or the record must show conduct constituting the offense plus an act or acts by the defendant done with intent to promote or assist such conduct. *Beier v. State,* 687 S.W.2d 2, 3 (Tex.Crim. App.1985). In a prosecution under the law of parties, it must be shown that the accused knew he was assisting in the commission of the offense. *Amaya v. State,* 733 S.W.2d 168, 174 (Tex.Crim.App.1986).

■■■■ Participation in a criminal offense may be inferred from the circumstances. *Beardsley v. State,* 738 S.W.2d 681, 684 (Tex.Crim.App.1987); *Phelps v. State,* 730 S.W.2d 198, 200 (Tex.App.—San Antonio 1987, no pet.). While an agreement of the parties to act together in common design seldom can be proved by direct evidence, reliance can be had on the actions and words of the parties showing by either direct or circumstantial evidence, an understanding and common design to do a certain act. *Mayfield v. State,* 716 S.W.2d 509, 514 (Tex.Crim.App.1986); *Ex parte Prior,* 540 S.W.2d 723, 727–28 (Tex.Crim. App.1976).

■■■■ In determining whether an accused was participating as a party to the offense, the courts may look to events before, during and after the commission of the offense. *Medellin v. State,* 617 S.W.2d 229, 231 (Tex.Crim.App.1981); *Bush v. State,* 506 S.W.2d 603 (Tex.Crim.App.1974). *See also Curren v. State,* 656 S.W.2d 124, 130 (Tex.App.—San Antonio 1983, no pet.). The agreement, if any, however, must be before or contemporaneous with the criminal offense. *Urtado v. State,* 605 S.W.2d 907 (Tex.Crim.App.1980). Mere presence alone without evidence of intentional participation is insufficient. *Acy v. State,* 618 S.W.2d 362 (Tex.Crim.App.1981).

Presence at the scene of the commission of the offense is, however, a circumstance which, when taken with other facts, may be sufficient to show that the accused was a participant. *Harris v. State,* 645 S.W.2d 447, 457 (Tex.Crim.App.1983).

8. *Reyes v. State,* 575 S.W.2d 38, 40 (Tex.Crim. App.1979).

Each case, of course, stands on its own merits. It is an unassailable fact in the instant case that the heroin upstairs was in the possession of someone and that it had been previously acquired. The State did not make it clear at trial nor in its appellate brief just whom it considered to be the primary actor or actors whose unlawful intent appellant supposedly knew and with whom appellant was "acting together." Here again the State relies upon appellant's presence downstairs plus his actions according to Delgado's testimony.

Viewing the evidence in the light most favorable to the prosecution and the jury's verdict, we conclude that the jurors as rational triers of fact could not have found beyond a reasonable doubt that the evidence excluded every other reasonable hypothesis except that of appellant acting with the intent to promote or assist in the commission of the heroin solicited, encouraged, directed, aided or attempted to aid the primary actor or actors in the commission of the offense. We find the circumstantial evidence upon which the State relies to show appellant's guilt under the law of parties to be insufficient. *See Porter v. State*, 634 S.W.2d 846 (Tex.Crim.App.1982); *Ortiz v. State*, 577 S.W.2d 246 (Tex.Crim. App.1979). Appellant's first two points of error are sustained.

In view of our disposition of the initial points of error, we do not reach appellant's other points of error. As a result of the insufficiency of the evidence to support the conviction, the judgment is reversed, and the appellant in light of constitutional double jeopardy standards, is ordered acquitted. *See Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

PEEPLES, Justice, dissenting.

I dissent because the evidence, viewed favorably to the jury verdict, is sufficient. The combined and cumulative force of all the incriminating circumstances may be sufficient to support the jury's finding. *Livingston v. State*, 739 S.W.2d 311, 330 (Tex.Crim.App.1987), *cert. denied*, 487 U.S.

1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex.Crim.App.1987).

There was a large quantity of controlled substance, considering the amount flushed before the officers could reach the bathroom and the two baggies that they recovered. The jury could reasonably have thought that whatever Mario flushed first was at least as incriminating as what remained unflushed by the time the police fought their way to the bathroom. Lookouts shouted "Los Narcos, Mario" when the raid team arrived and exited their cars. Appellant used force to prevent Officer Delgado, who was wearing a raid jacket with "Police" prominently displayed, from going up the stairs where the toilet was flushing. The jury was entitled, under all the evidence, to find appellant guilty as a party, the primary actor being Mario Barajas (whom the lookouts addressed when they shouted "Los Narcos, Mario," "Get the stuff to Mario," and whose flushing efforts appellant was trying to protect at the stairs).

I would hold that the verdict is supported by sufficient evidence.